

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NORTHERN TRUST COMPANY and CASUALTY COMPANY OF READING, PENNSYLVANIA,<br><br>Plaintiffs,<br><br>vs.<br><br>MS SECURITIES SERVICES, INC., BEAR STEARNS AND COMPANY, INC., and BEAR SECURITIES COMPANY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 05 C 3370 |
| THE NORTHERN TRUST COMPANY and AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,<br><br>Plaintiffs,<br><br>vs.<br><br>MERRILL LYNCH & CO., INC., and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   No. 05 C 3373<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Northern Trust Company (Northern) and American Casualty Company brought this action against Bear Stearns and Company, Bear Stearns Securities Corporation, MS Securities Corporation, Merrill Lynch & Co., and Merrill Lynch, Pierce, Fenner & Smith Incorporated,[1] and seek to recover the value of tax credits connected to shares of securities that

---

[1] This case was reassigned to this court on October 13, 2005, in light of the earlier case, United States v. Northern Trust Co., as Trustee (98 C 7272), (98 C 8217), 93 F. Supp. 2d 903 (N.D. Ill. 2000), rev'd 372 F.3d 886 (7th Cir. 2004). The case against MS Securities and Bear Stearns is 05 C 3370. Kidder, Peabody & Co., Inc., was initially a named defendant in the 05 C 3370 action, but has been voluntarily dismissed by plaintiffs

Northern loaned to defendants pursuant to securities lending agreements. Defendants now move to dismiss Northern's complaint under FED. R. CIV. P. 12(b)(6). For the following reasons, defendants' motions are granted in part and denied in part.

## BACKGROUND

The following background is taken from Northern's complaint and the attached documents. Northern is an Illinois banking corporation that serves as trustee and lending agent for two corporate pension trusts. As such, Northern entered into separate lending agreements with each defendant. Pursuant to those agreements, it loaned shares of the pension trusts' securities to defendants who, in return, supplied collateral and paid Northern a nominal fee. At the conclusion of the lending period defendants returned the borrowed shares, or equivalent shares, to Northern, who then returned the collateral to defendants.

The lending agreements contain nearly identical provisions that set forth defendants' rights and Northern's entitlement to distributions that arose from the borrowed securities.[2] Paragraph 4 of Northern's 1981 agreement with Merrill Lynch provides that, for the duration of the loan:

> The Borrower shall have all of the incidents of ownership of the securities including, but not limited to, the right to transfer or loan the securities to others; provided, however, the Borrower shall be obligated to Lender in respect to all dividends, interest and distribution pertaining to the securities set forth in Section 5.

And, as paragraph 5 of the agreement sets forth:

> [Northern Trust] shall be entitled to receive all distributions made by the issuers of the Borrowed Securities during the term of the Loan, including cash

(see 05 C 3370, Docket No. 5) (June 21, 2005). The case against the Merrill Lynch defendants is 05 C 3373.

[2]Northern entered into two agreements with Merrill Lynch, first in 1981 and then in 1988. Northern and MS Securities also first entered into an agreement in 1981. One year later Northern and Bear Stearns entered into an agreement, and then, in 1994, they agreed to a second contract.

dividends, stock dividends, stock splits, interest distributions of any kind declared, granted or made by the issuer, or any affiliate thereof, and rights to purchase or subscribe for additional securities.

The analogous provision in Northern's 1994 agreement with Bear Stearns sets forth the parties' obligations in greater detail:

> Lender shall be entitled to receive all distributions made on or in respect of any Loaned Securities the payable dates (or if applicable the record dates) for which are during the term of the Loan and which are not otherwise received by Lender, to the full extent it would be so entitled if the Loaned Securities had not been lent to Borrower, including, but not limited to, all: (a) property; (b) stock dividends; (c) securities received as a result of split-ups of the Loaned Securities and distributions in respect thereof; (d) interest payments; and (e) rights to purchase additional securities. Lender shall also be entitled to receive any distributions made on or in respect of the Loaned Securities which are paid to Borrower after termination of the Loan, to the full extent it would be so entitled if the Loaned Securities had not been lent to Borrower.

Northern claims that these provisions and industry custom obligated defendants to compensate Northern for all economic benefits of ownership associated with the borrowed shares. According to Northern, the economic benefits which it was entitled to receive, included any "constructive distribution and related tax benefit" (plf. cplt. ¶¶ 4; 4).[3]

Northern alleges that defendants and related third parties claimed the tax credits, when they should have returned the value of those credits to Northern. Despite the fact that the tax credits had already been claimed, Northern used those credits for tax refunds on behalf of the pension trusts for the tax years 1991 through 1995. In 1998, the Internal Revenue Service determined that Northern was not entitled to the credits and requested that Northern repay the refunds it received. Eventually, the IRS brought two actions against Northern seeking the value of those refunds. After litigation, Northern settled with the IRS. Northern now seeks

---

[3]Citations to plaintiffs' complaints will include reference to both actions, with the lower numbered action, the MS Securities and Bear Stearns complaint, listed first.

to recover the value of the tax credits, the interest it paid to the IRS. and the expenses it incurred while defending its claims.[4]

Northern seeks recovery on five grounds. Count I is a breach of contract claim, in which Northern contends that defendants' failure to provide compensation for the constructive distribution and related tax credits or refunds violated the terms of the lending agreements and breached a covenant of good faith and fair dealing. In Count II, Northern asserts that it placed a special trust and confidence in defendants, and that by diverting the benefits of ownership, in the form of the tax credits, defendants breached their fiduciary duties. In Count III, Northern seeks to recover under an unjust enrichment or the related *quantum meruit* theory, and contends that if there is not an enforceable contract, then it has conferred to defendants benefits they did not bargain to retain. In Count IV, Northern claims that to the extent the contracts do not require compensation, they are the result of mistake and should be reformed. Lastly, in Count V, Northern seeks to rescind the contracts if they do not require compensation.

Defendants move to dismiss all counts in Northern's complaint. In seeking to dismiss Count I, defendants argue that the contracts gave them all incidents of ownership of the securities, subject to limited exceptions that do not include the tax benefits arising from undistributed long-term capital gains. According to defendants, those tax benefits are not distributions made by QFV, the issuer of the borrowed securities, which renders paragraph 5 of the lending agreements inapplicable. Defendants also argue that the claims for attorneys'

---

[4]Northern seeks $600,371 in tax benefits from Merrill Lynch, and $403,067 in litigation costs. It claims that the other brokerage firms owe it approximately $5.65 million and $6.9 million in litigation expenses.

fees and interest must be dismissed because those damages are not proximately caused by any alleged wrongdoing of defendants. Defendants argue that Count II must be dismissed because, as a matter of law, a securities lending relationship does not create a fiduciary duty between the parties. Defendants state that the existence of a valid contract covering the disputed issues precludes the quasi-contractual relief sought in Count III. According to defendants, Count III must also be dismissed because Northern has failed to allege that retention of benefits violates equitable principles. Defendants assert that Count IV is defective because Northern has failed to plead either mutual mistake of fact or unilateral mistake, accompanied by fraud. Defendants argue that Northern has failed to plead the elements of rescission, which include the ability to return the parties to the status quo ante.

## DISCUSSION

Under Rule 12(b)(6) a complaint may be dismissed if it fails "to state a claim upon which relief can be granted." Dismissal is improper if there is any set of facts consistent with the allegations that support the claim for relief. Lekas v. Briley, 405 F.3d 602, 606 (7th Cir. 2005); Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). All well-pleaded allegations are accepted as true, and all reasonable inferences are drawn in Northern's favor. McCullah v. Gadert, 344 F.3d 655, 657 (7th Cir. 2003); Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996). To survive defendants' motions, Northern need not show that it will ultimately prevail, but only that it is entitled to offer evidence in support of its claims. Cole v. U.S. Capital, Inc., 389 F.3d 719, 724 (7th Cir. 2004). Since a 12(b)(6) motion focuses on a plaintiff's ability to state a claim, the court will generally only consider the complaint. Rosenblaum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir. 2002). However, documents attached to the complaint, such as the securities lending agreement here,

become part of the complaint and may be considered without converting the motion to dismiss

into a motion for summary judgment. 188 LLC v. Trinity Indus. Inc., 300 F.3d 730, 735 (7th

Cir. 2002); Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002).

We begin by reviewing the mechanics of QFV's treatment of the long-term capital

gains. [5] The Supreme Court recognized securities lending relationships in Provost v. United

States, 269 U.S. 443, 452 (1926), and characterized the attendant obligations in these terms:

> During the continuance of the loan the borrowing broker is bound by the loan
> contract to give the lender all the benefits and the lender is bound to assume all
> the burdens incident to ownership of the stock which is the subject of the
> transaction, as though the lender had retained the stock.

Provost also observed that the parties typically entered into securities lending agreements so

that the borrower, or a related third-party, could execute short sales (id. at 450-51, 455), which

usually involves the sale of a security with the intent to repurchase it at a lower price. The

lender's principal motivation is a fee that it receives from the borrower as consideration for

the loan. As the above-quoted passage conveys, at the conclusion of the loan period the

borrower is obligated to return the lender to the position it would have occupied had the loan

not transpired. Also evident is the contract's primary role in establishing the parties'

obligations. See id. at 456 (borrower's responsibility to restore the lender to the position "he

would have been, as owner of the stock, had the loan transaction not been entered into" is

"wholly contractual"). We reference Provost only to highlight basic principles that underlie

---

[5]We requested supplemental memoranda from the parties regarding the nature of the financial
transactions. The parties obliged, and provided information that addressed some of our discrete concerns
regarding the economic consequences and tax liabilities. However, the memoranda frequently presented
combating hypothetical scenarios that invite intense fact-sensitive inquiries, which we hesitate to engage in at
this stage. The memoranda also include unnecessary sparring over alleged tax arbitrage schemes, which we
disregard for now. Defendants also argue that Northern has failed to set forth factual support for its claims,
but it is notice, not factual support, that Northern must now present. Brown v. Budz, 398 F.3d 904, 908 (7th
Cir. 2005).

these complex business relationships.

Defendants borrowed shares issued by the Quest for Value Dual Purpose Fund (QFV), a closed-end mutual fund. Although defendants borrowed varying amounts of shares over the course of several years, the borrowing patterns were the same. Typically, defendants would borrow QFV shares before December 31st, hold the shares on that date and then sell them shortly thereafter. By holding the shares on December 31st, defendants became the formal shareholders of record.

QFV is a regulated investment company (RIC), and as such its shareholders enjoy certain tax advantages under 26 U.S.C. § 852(b)(3)(D). QFV declared both short- and long-term capital gains. Defendants received the short-term capital gains distributions due to their status as shareholders of record, and Northern acknowledges that it received the value of the short-term capital gains distributions from defendants (*see, e.g.*, plf. cplt. ¶¶ 45; 31). In contrast, the process of distributing the long-term capital gains did not result in a transfer of funds from defendants to Northern.

Instead of making a cash distribution of long-term capital gains to the record shareholders, QFV made a constructive distribution pursuant to section 852(b)(3)(D), which allowed QFV to treat the long-term capital gains as if they were actually distributed to shareholders, who then reinvested the proceeds in the fund. According to the parties, QFV made a constructive distribution of long-term capital gains, and as part of that distribution paid taxes on the gains. That tax payment increased the tax basis of each share. The shareholders of record included any undistributed capital gains as income. 26 CFR 1.852-4(b)(2)(i). Those shareholders are deemed to have paid taxes on those gains, even though the taxes were actually paid by the fund. *Id.* at 1.852-4(b)(2)(ii). The shareholders are then entitled

to claim tax credits for taxes paid by the fund, so that double payment of taxes is avoided. *See* section 852(b)(3)(D)(ii). As the shareholders of record, defendants took the tax credit for the constructive distribution. Thus, a tax scenario aimed at avoiding double taxation resulted in double credit-taking.

## Count I – Breach of Contract

To state a claim for breach of contract under Illinois law, Northern must allege "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." Henderson-Smith & Associates, Inc. v. Nahamani Family Serv. Ctr., Inc., 323 Ill. App. 3d 15, 752 N.E.2d 33, 43, 256 Ill. Dec. 488 (2001). Even on a motion to dismiss, courts should not accept a contract interpretation that yields absurd and commercially nonsensical results. Beanstalk Group, Inc. v. AM Gen. Corp., 283 F.3d 856, 860, 862 (7th Cir. 2002).

We begin our analysis with the language of the contract itself. Emergency Med. Care v. Marion Mem'l Hosp., 94 F.3d 1059, 1061 (7th Cir. 1996). Under the "four corners rule," to determine the parties' intent we look to the plain and ordinary meaning of the contract's language, unless that language is ambiguous. Davis v. G.N. Mortg. Corp., 396 F.3d 869, 878 (7th Cir. 2005); Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998); Air Safety, Inc. v. Teachers Realty Corp., 185 Ill.2d 457, 462, 706 N.E.2d 882, 884, 236 Ill. Dec. 8 (Ill. 1999) (a written contract is presumed to speak to the parties' intent). The meaning of unambiguous contracts may be determined as a matter of law. Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995). Mere disagreement over the precise meaning of a contractual term does not create ambiguity. Emergency Med. Care, 94 F.3d at 1061. Rather, a term is ambiguous if it is "reasonably and fairly susceptible to more than one meaning." *Id.*

(quoting CSX Transp. v. Chicago and North Western Transp., 62 F.3d 185, 189 (7th Cir. 1995)); *see also* Murphy, 61 F.3d at 565 ("a contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract"). In interpreting the contract as a whole, courts should remain sensitive to the contract's commercial context. Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004); Beanstalk Group, 283 F.3d at 860; Merchants Environmental Indus., Inc. v. SLT Realty L.P., 314 Ill. App. 3d 848, 731 N.E.2d 394, 405, 246 Ill. Dec. 866 (Ill. App. 1st Dist. 2000).

As Provost instructs, the parties' obligations are governed by the lending agreements and not necessarily by ownership of the securities. All parties identify the phrase, "all distributions made by the issuers of the Borrowed Securities," from paragraph 5, as the central language. Defendants stress that the contract language is unambiguous, and that the tax benefits arising from the undistributed long-term capital gains are not distributions and are given by the Tax Code, not by QFV, the issuer of the borrowed securities. They further contend that paragraph 4 gives them "all of the incidents of ownership," which includes the tax benefits that are not specifically enumerated in paragraph 5. Merrill Lynch also argues that "distribution by the issuer" literally excludes undistributed capital gains. Defendants thus argue that the "breach" element of the breach-of-element claim has not been pled.

Northern offers a broader interpretation of the contract language, emphasizing that paragraph 5 of the lending agreements obligated defendants to compensate Northern for "all distributions . . . of any kind declared." In Count I, Northern speaks of lost "benefits," and ties those benefits to "the constructive distributions and related tax benefit arising from the QFV shares that MS Securities borrowed" (plf. cplt. ¶¶ 67, 69; 50). Elsewhere in the complaint, Northern explains that QFV's treatment of the long-term capital gains, enabled by

section 852(b)(3)(D), yielded "concomitant tax benefits arising from the taxes paid by QFV," and that those taxes represented "substantial economic benefits" to Northern (plf. cplt. ¶¶ 49; 35). Thus, it is not solely the undistribution, or constructive/deemed distribution of long-term capital gains that is the "distribution made by the issuers of the Borrowed Securities." Rather, Northern alleges that the contract also includes the tax benefits that necessarily accompanied that distribution. Northern urges the court to reference industry custom and trade usage of the industry-specific terms.

Both sides argue that their interpretations of the contract are supported by the plain language of the lending agreements. Both sides cannot be correct. The term "distribution" is not defined in the contract, so we must attempt to glean its meaning from the contract as a whole. *See* Heller Fin., Inc. v. Prudential Ins. Co. of Am., 371 F.3d 944, 946 (7th Cir. 2004). Defendants contend that paragraph 4 of the agreements established a default rule that gave them, as borrowers,"all incidents of ownership of the securities."[6] The broad scope of a borrower's rights of ownership is clearly limited by the lender's rights to receive distributions. Thus, reading the contract as a whole, we cannot conclude that defendants were entitled to the tax benefits pursuant to the "all incidents of ownership" provision, without first determining whether those benefits could possibly be construed as "distributions."

In support of their contention that the tax benefits are not distributions, defendants rely on *ejusdem generis*, a rule of interpretation, providing that when general terms follow specific terms, the general terms should be construed in the context of the more specific terms. Ortloff v. United States, 335 F.3d 652, 658-59 (7th Cir. 2003); BLACK'S LAW DICTIONARY 517 (6th ed. 1990). We are not convinced that the rule should be used here with the certainty and to the

---

[6]This language appears in paragraph 5 of the 1994 Bear Stearns Agreement.

extent proposed by defendants. The rule is used to ascertain the meaning of terms when there is uncertainty. Garcia v. United States, 469 U.S. 70, 74 (1984). However, defendants raise ambiguity as a secondary claim, as they first contend that the contract's plain language is unambiguous and supports their position. Moreover, the list of specific distributions is prefaced by the word "including," which means that the specific terms are illustrative and not exclusive. See Majchrowski v. Norwest Mort., 6 F. Supp. 2d 946, 965 (N.D. Ill. 1998). Also, at the conclusion of the list, the phrase "of any kind" appears, further suggesting breadth. Similarly, in paragraph 6 of the 1994 Bear Stearns contract, prefacing the list of specific distributions, is the phrase, "including, but not limited to." Thus, the list is book-ended by terms suggesting breadth rather than limitation. See Corbin on Contracts, § 24.28 ("there is a strong likelihood that the parties intended that the general classification include not only items resembling those enumerated, but also items of other sorts" if the phrase, "including, but not limited to," is used).

Also significant is the fact that the general term is followed by specific terms. When a list of specific terms precede, it is sensible to apply the *ejusdem generis* rule, which essentially interposes words such as "other" or "similar" before the general term. Indeed, such qualifiers frequently appear before the general term. See Center Video Indus. Co. v. Roadway Package Sys., 90 F.3d 185, 187 (7th Cir. 1996) (applying *ejusdem generis* to the phrase, "carrier reserves the right to accept cash, cashier's check, certified check, money order or other similar instrument"); Newsom v. Friedman, 76 F.3d 813, 820 (7th Cir. 1996) ("Judicial district or similar legal entity"); People v. Davis, 199 Ill.2d 130, 766 N.E.2d 641, 645-46, 262 Ill. Dec. 721 (Ill. 2002) (construing a statute that concluded with the phrase "any other deadly or dangerous weapon or instrument of like nature"). However, words of limitation do not seamlessly fit

when the general term precedes the specific terms. Instead, one will likely encounter "including" or "including, but not limited to." In considering defendants' arguments, we do not limit the meaning of distribution to the specific terms enumerated, but instead consider whether paragraph 5 could possibly encompass the tax benefit that Northern seeks.

Defendants contend that the tax credits are not distributions because they are not easily determined. In response, Northern asserts that QFV was required to publish a statement showing the tax it paid on behalf of the shareholders for the constructive distributions that the shareholders declared as income. Northern is correct on this point, as 26 C.F.R. § 1852-9(a)(1)(i) states, "[a] designation of undistributed capital gains under section 852(b)(3)(D) and paragraph (b)(2)(i) of § 1.852-2 shall be made by notice of Form 2439 mailed by the regulated investment company to each person who is a shareholder of record of the company at the close of the company's taxable year." Based on Form 2439, the tax credit due a shareholder may be calculated. Presumably, this form can be "promptly delivered" to Northern pursuant to the lending agreements.

Defendants further argue that the tax credits are not made by QFV, the issuer, but they instead arise from the Tax Code. Even though the specific tax credit or refund was given pursuant to section 852(b)(3)(D)(ii), that benefit was only possible because the QFV paid taxes on a constructive distribution. The tax benefit may be a distribution by the issuer when it is a direct result from QFV's payment of taxes on behalf of the shareholder. Thus, the issuer makes a cash outlay and the shareholder receives a benefit that mirrors that distribution. The undistributed capital gain resulted in no cash distribution by QFV, but it did result in a tax credit. The fact that a third party is involved – here in the form of the IRS who allows a credit to be taken once the issuer has paid the necessary taxes – does not by itself show that the tax

benefit is not a distribution, as contemplated by the lending agreements. On this point, Northern's reference to payments to third parties, such as escrow agents, is persuasive.

Defendants also claim that Northern really alleges two separate distributions, first, the constructive distribution of long-term capital gains, and then the tax payment to the IRS, which resulted in a tax credit to the shareholder. When dissected, the transaction can be broken down into component parts, but this does not mean that Northern fails to state a claim. The distributions enumerated in paragraph 5, such as cash and stock dividends, may be accompanied by certain tax benefits. Actual benefits may depend on the shareholder's tax status and may arise only after relevant provisions of the Tax Code are triggered by the distribution. We do not think that borrowers return a distribution if they compensate the lender for a cash dividend, but preclude the lender from using that dividend for tax purposes. Moreover, the 1994 Bear Stearns agreement specifically contemplates returning the lender to the position it would have been in had the loan not been made. By focusing on the tax credits themselves, defendants effectively sever the credits from the process that created them. We are not willing at this stage to see the generation of the tax credits as entirely separate from the constructive distribution of long-term capital gains.

Even though it is not proper at this stage to sever the ultimate tax benefit from QFV's constructive distribution and tax payment, the concept of separating the transaction into its component parts helps us assess the reasonableness of Northern's interpretation of the contract. As mentioned above, due attention should be given to the lending agreement's commercial context, and courts should not endorse an interpretation of a contract that is absurd in light of that context. Beanstalk Group, 283 F.3d at 856;   Bank of Am., N.A. v. Moglia, 330 F.3d 942, 946 (7th Cir. 2003); Gerow v. Rohm & Haas Co., 308 F.3d 721, 725 (7th

Cir. 2002).

For example, requiring the record shareholder to declare the undistributed long-term capital gain as income, but preventing him from offsetting that income with the tax credit created by QFV's tax payment, could be unreasonable. In describing the mechanics of section 852(b)(3)(D), Northern writes that QFV shareholders were required to report the constructive distribution as income, but were allowed a tax credit "reducing or eliminating the tax due on the increased income stemming from" reporting the income (plf. cplt. ¶ 48(C)-(D) (BS/MS), plf. cplt. ¶ 34(C)-(D) (ML)). The payment of taxes at the individual and corporate levels would defeat the purpose of section 852(b)(3)(D). Further, absent other motivations, a borrower would not likely enter into an agreement that imposes economic burdens of tax payments without coordinate benefits. Also, if Northern's clients could not claim the tax credits even if Northern had been the shareholder of record, the return of those tax credits would result in an unreasonable windfall. Utica Mut. Ins. Co. v. Vigo Coal Co., 393 F.3d 707, 711 (7th Cir. 2004) (quoting Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 19 (1st Cir. 2004) ("If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives")).

We will not endorse a reading of the contract that yields a commercially unreasonable result. Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH, 392 F.3d 881, 883 (7th Cir. 2004) ("When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided"). However, Northern has adequately shown that its interpretation of the lending agreements would not

invariably lead to a commercially unreasonable outcome. The retention of tax benefits would not be necessary to effectuate a short sale, a common purpose in securities lending agreements. Northern also presents several scenarios in which defendants could return the tax benefits without incurring economic loss after being stuck with a gain and deprived of the offsetting tax credit. Defendants contend that Northern's scenarios are invalid in light of the actual trading values. And in response Northern asserts that defendants' data fails to take account of important economic factors. Defendants then refute that claim. As stated above, our task here is not to determine which side's volley falls short. Determining which side presents the correct or most reasonable version of what actually transpired calls for "knowledge of the specific facts of the case ('adjudicative facts')." Beanstalk Group, 283 F.3d at 862. Under the standard of review, we need only determine whether any set of facts consistent with the allegations would entitle Northern to the relief it seeks.

Northern also claims that it would not make economic sense for it to loan the securities if doing so meant forfeiting a valuable tax credit. According to Northern, had it not lent the shares over the record date it could have claimed the tax credits without penalty. Northern asserts that both industry practice and the lending agreements obligated defendants to return Northern to the position it would have been in had it not made the loans. This contention is supported by Provost, 269 U.S. at 456, and paragraph 6 of the 1994 Bear Stearns agreement ("Lender shall also be entitled to receive any distributions made on or in respect of the Loaned Securities which are paid to Borrower after termination of the Loan, to the full extent it would be so entitled if the Loaned Securities had not been lent to Borrower").

Industry custom, trade usage and related extrinsic evidence will help illuminate the accepted meaning of "distribution," and whether the industry views the tax benefits at issue

here to be distributions that must be returned to the lender. Northern emphasizes that the court need not find the contract ambiguous in order to consider extrinsic evidence. However, the cases Northern cites do not review extrinsic evidence in light of a motion to dismiss.[7] In Joy v. Hay Group, Inc., 403 F.3d 875, 878 (7th Cir. 2005), the court opined that reference may be made to extrinsic evidence even if a contract is clear on its face, "provided the evidence used to show this is 'objective' in the sense of not being merely self-serving, unverifiable testimony." The court also noted that when the contract language is unclear, "any evidence admissible under the rules of evidence is usable to establish the contract's meaning." Id. However, Joy also involved review of a summary judgment ruling. Reliance on extrinsic evidence presents distinct concerns for motions to dismiss.

Mere reference to industry custom, trade usage, and other extrinsic evidence, should not be sufficient alone to create issues of fact warranting the denial of a motion to dismiss. Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 565 (7th Cir. 1995) ("extrinsic evidence cannot be used to create ambiguity"). We mention these points because industry custom and related extrinsic evidence should not be used to defeat a motion to dismiss without a finding that the contract language is at least susceptible to multiple reasonable interpretations. Such a finding will help ensure that the extrinsic evidence serves to illuminate and not create ambiguous language. See Utica Mut. Ins. Co. v. Vigo Coal Co., 393 F.3d at 713 (four-corners

---

[7]In Northern's cases, parties attempted to introduce extrinsic evidence during trial, appeal, or summary judgment motion. Merchants Envt'l Indus., Inc. v. SLT Realty L.P., 731 N.E.2d 394, 405 (summary judgment); Longview Aluminum, LLC v. United Steelworkers of Am., 213 F. Supp. 2d 876 (N.D. Ill. 2002) (summary judgment); Puckett v. Oelze, 134 Ill. App. 3d 1020, 481 N.E.2d 867, 871, 90 Ill. Dec. 67 (Ill. App. 5th Dist. 1985) (trial); Sklodowski v. Countrywide Home Loans, Inc., 358 Ill. App. 3d 696, 832 N.E.2d 189, 194, 295 Ill. Dec. 38 (Ill. App. 1st Dist. 2005) ("Countrywide attached Fannie Mae's Servicing Guide for Single Family Residential Mortgages to its motion for summary judgment"); Cook, Inc. v. Boston Scientific Corp., 333 F.3d 737 (7th Cir. 2003) (summary judgment); Bristow v. Drake St. Inc., 41 F.3d 345 (7th Cir. 1994) (trial). Moreover, in Bristow, the Seventh Circuit observed that "Illinois courts seem unwilling to admit evidence of trade usage unless the text of the contract seems to admit of some doubt or uncertainty." Id. at 352.

rule "will unravel if extrinsic evidence can be used to demonstrate ambiguity"). Even though disagreement "over the precise meaning of a contractual provision does not render the contract ambiguous" (Emergency Med. Care, 94 F.3d at 1061), at this stage the different interpretations offered by the parties appear reasonable. Murphy, 61 F.3d at 565 (7th Cir. 1995) ("a contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract"); Bourke, 159 F.3d at 1036. The word "distribution" is clear on its face, but its meaning becomes less clear when it is applied in the complex context of securities lending relationships. See Rossetto v. Pabst Brewing Co., 217 F.3d 539, 542 (7th Cir. 2000)  Extrinsic evidence, especially of the objective variety (see In re Envirodyne Indus., 29 F.3d 301, 305 (7th Cir. 1994)), will help lead to the correct interpretation.

Defendants also contend that Northern's allegations that defendants' failure to return the value of the tax benefits breached "the covenant of good faith and fair dealing," is superfluous and should be dismissed (plf. cplt. ¶¶ 67, 69; 50). Defendants cite Batteast Const. Co. v. Pub. Bldg. Comm'n of Chicago, 195 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002), in which the court observed that because the obligation to deal in good faith is implied in every contract, a breach of that obligation is merely a breach of the underlying contract. Northern gives this issue glancing attention in a footnote, arguing only that it has pleaded independent breaches of the lending agreements' terms. But even if each breach of good faith and fair dealing corresponded to breaches of independent terms, so long as those terms were part of a single contract, the breach of good faith and fair dealing claims would still simply be a breach of that underlying contract. In Batteast, the plaintiff alleged the breach of implied covenant of good faith and fair dealing in a separate count. In contrast, Northern alleges that defendants breached the covenant of good faith and fair dealing in Count I, and even in the same sentence

as mentioning defendants' alleged breaches of the lending agreements.

In Industrial Specialty Chems. v. Cummins Engine Co., 902 F. Supp. 805, 811 (N.D. Ill. 1995), the plaintiff pled breach of implied covenant of good faith and fair dealing in a count separate from the breach of contract count. The court concluded that the former "cannot stand as a separate count, but must be included within its breach of contract claim in Count I," and it then extended to plaintiff the opportunity to re-allege the implied covenant of good faith claim. *Id. See also* Banco Del Estado v. Navistar Int'l Transp. Corp., 942 F. Supp. 1176, 1182 (N.D. Ill. 1996) ("Any claim for breach of the implied covenant of good faith must be included within a breach of contract claim"); Aggarwal v. Nokia Corp. (In re Wireless Tel. 911 Calls Litig.), 2005 U.S. Dist. LEXIS 13707, *45, 2005 WL 1564978 (N.D. Ill. 2005) (dismissing separately pled implied covenant of good faith and fair dealing claim as superfluous); Calderon v. Southwestern Bell Mobile Sys., LLC, 390 F. Supp. 2d 714, 719 (N.D. Ill. 2005) (same). Northern has not pled defendants' alleged breach of the covenant of good faith and fair dealing as a separate claim, which is sufficient to defeat dismissal.

In sum, Northern has stated a claim for breach of contract. The language of paragraph 5 of the lending agreements, and paragraph 6 of the 1994 Bear Stearns agreement, does not exclude the tax benefits from serving as distributions. Northern's interpretation of the contract, and the scenarios it has presented in support of that interpretation, are not obviously commercially unreasonable. Northern has also alleged that the parties intended for it to be returned to the position that it would have occupied had the loans never been made.

## Count II – Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must allege (1) that a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the damages

proximately resulting from the breach. Neade v. Portes, 193 Ill.2d 433, 739 N.E.2d 496, 502, 250 Ill. Dec. 733 (Ill. 2000); Romanek v. Connelly, 324 Ill. App. 3d 393, 753 N.E.2d 1062, 1072, 257 Ill. Dec. 436 (Ill. App. 1st Dist. 2001). The party seeking relief has the burden of proving the existence of a fiduciary duty. In re Estate of Rothenberg, 176 Ill. App. 3d 176, 530 N.E.2d 1148, 1150, 125 Ill. Dec. 739 (Ill. App. 1st Dist. 1988). Defendants argue that they did not owe a fiduciary duty to Northern, and that the breach of fiduciary duty claim must therefore be dismissed. In response, Northern contends that a fiduciary relationship arose out of the special relationships between it and defendants.

A fiduciary relationship may arise as a matter of law based on a particular category of relationship, such as attorney-client and principal-agent, or "as a result of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." Ransom v. A.B. Dick Co., 289 Ill. App. 3d 663, 682 N.E.2d 314, 322, 224 Ill. Dec. 753 (Ill. App. 1st Dist. 1997). To determine whether a fiduciary relationship exists under the special relationship standard, courts look to relevant factors, including "the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant' party and placed trust and confidence in it." *Id.*

Instead of arguing that a fiduciary relationship exists as a matter of law, Northern claims that a special relationship existed between it and defendants, and it focuses on the final factor listed in Ransom. Northern contends that in the securities lending relationships, it placed "special trust and confidence in the borrower[s]" (plf cplt. ¶¶ 74; 55). Northern further alleges that instead of specifying that the brokerages could not borrow specific types of

securities with certain benefits, it relied on its trust and confidence that the borrowers would not claim the benefits of ownership for themselves (*id.* at ¶ 75 (MS/BS); ¶ 56 (ML)). Northern states that it developed the special trust and confidence with defendants over the course of many years of doing business under securities lending agreements (*id.* at ¶ 76 (MS/BS); ¶ 57 (ML)). In response, defendants contend that even assuming these allegations to be true, they do not support the existence of a fiduciary duty.

While Northern states it trusted defendants to borrow the securities and not retain the economic benefits to which Northern claims it was entitled to receive, this trust alone does not establish a fiduciary duty. The cases discuss a party's trust and confidence in the context of the other party's dominance. *See* <u>In re Estate of Rothenberg</u>, 530 N.E.2d at 1150 (noting that there may be a fiduciary duty when "there is trust reposed on one side and resulting superiority and influence on the other"). A party's entrustment of business operations in another creates a disparity in power and may yield a fiduciary relationship. In <u>Ransom</u>, the defendants had access to plaintiff's business plans, attended plaintiff's meetings and extended credit to plaintiff. <u>Ransom</u>, 682 N.E.2d at 322. The defendants also assigned its chief financial officer to help plaintiff drum up new investors. *Id.* The plaintiff, as the servient party, essentially put its business affairs in the defendants' hands, while the defendants, as the dominant parties, agreed to exercise their judgment on behalf of the plaintiff. *Id.*

Similarly, in <u>DeValk Lincoln Mercury, Inc. v. Ford Motor Co.</u>, 550 F. Supp. 1199, 1203 (N.D. Ill. 1982), the plaintiff alleged that it was "substantially under the control" of the defendant and others, which caused the plaintiff "to rely on the latter parties' utmost good faith and fair dealing." Further, in <u>E&J Gallo Winery v. Morand Bros. Beverage Co.</u>, 247 F. Supp.2d 979, 985 (N.D. Ill. 2003), the defendant, in a counterclaim, alleged that the plaintiff

"exercised a degree of domination, control, and even intimidation" of it, and that it placed "a high degree of trust in [the defendant] to not take advantage of" it.  In Burdett v. Miller, 957 F.2d 1375, 1381-82 (7th Cir. 1992), there was a pronounced disparity in knowledge and power when the defendant, a professor of accounting and owner of an accounting firm, suggested to plaintiff, who was "inexperienced and unsophisticated" in the ways of investments, that she invest in several tax shelters in which he had an interest.

In these cases, the trust and confidence arises in the context of a business relationship marked by a disparity in power, in which the more powerful entity has substantial control over the affairs of its counterpart. *See also* In re Estate of Rothenberg, 530 N.E.2d at1151 ("Two things must appear: that one party was, in fact, 'servient' and the other party 'dominant'"); Zurich Capital Mkts., Inc. v. Coglianese, 332 F. Supp. 2d 1087, 1121 (N.D. Ill. 2004) (quoting Lagen v. Balcor Co., 274 Ill. App. 3d 11, 653 N.E.2d 968, 975, 210 Ill.Dec. 773 (Ill. App. 2d Dist. 1995)) ("The touchstone of a fiduciary relationship is the presence of a significant degree of dominance and superiority of one party over another").  Absent from Northern's complaints are any allegations concerning a disparity in power, or any influence or superiority that defendants wielded over it.  Northern contends that it was the beneficial owner of the securities, and depicts defendants as having control of the securities during the loan period. Defendants' control of the securities does not transform it into a controlling or dominant party, as described in the cases. Defendants were not present in Northern's boardroom, nor did they make decisions on behalf of, and for the benefit of Northern. Northern does not allege that the lending agreements created an agency relationship.  Moreover, Northern, a sophisticated business entity, retained substantial control and power under the contract. *See* Zurich Capital, 332 F. Supp. 2d 1087 at 1121.  Defendants provided it with collateral and it

had the ability to terminate the lending relationship at its discretion. Northern's breach of fiduciary duty claim lacks key factors that support the existence of a fiduciary duty, and the claim is accordingly dismissed.

### Count III – Unjust Enrichment and Quantum Meruit

Unjust enrichment and *quantum meruit* claims are quasi-contract theories that allow courts to imply contracts in law in order to prevent unjust results. Hayes Mech., Inc. v. First Indus., L.P., 351 Ill. App. 3d 1, 812 N.E.2d 419, 426, 285 Ill. Dec. 599 (Ill. App. 1st Dist. 2004). To state a claim for unjust enrichment under Illinois law, a plaintiff must allege that a defendant retained a benefit to plaintiff's detriment and that the retention of the benefit violates fundamental principals of justice, equity and good conscience. HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 545 N.E.2d 672, 679, 137 Ill. Dec. 19 (Ill. 1989). "A party seeking recovery on a *quantum meruit* theory must demonstrate the performance of services by the party, the conferral of the benefit of those services on the party from whom recovery is sought, and the unjustness of the latter party's retention of the benefit in the absence of any compensation." First Nat. Bank of Springfield v. Malpractice Research, Inc., 179 Ill.2d 353, 688 N.E.2d 1179, 1185, 228 Ill. Dec. 202 (Ill. 1997). Even though an unjust enrichment claim cannot survive when a contract exists, parties may plead in the alternative (Fed. R. Civ. P. 8(e)(2)), and Northern may allege both breach of contract and unjust enrichment. *See* Cooper v. Durham School Services, 2003 U.S. Dist. LEXIS 25005, 2003 WL 22232833, *7 (N.D. Ill. 2003).

Because the parties' relationships are governed by contracts, Northern's quasi-contract claims must fall outside of the contract. Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 688-89 (7th Cir. 2004); *see also* Installco Inc. v. Whiting Corp., 336 Ill. App. 3d 776,

784 N.E.2d 312, 318, 271 Ill. Dec. 94 (Ill. App. 1st Dist. 2002) (internal quote marks and citations omitted) ("Where services are rendered under an express contract, there can be no quasi-contractual recovery . . . No quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests").

Northern seeks quasi-contractual relief to the extent that we hold an enforceable contract does not apply. To plead quasi-contractual theories in the alternative to a breach of contract claim, Northern must allege the absence of a contract. *See* Cromeens, Holloman, Siber, Inc. v. AB Volvo, 349 F.3d 376, 397 (7th Cir. 2003) ("Once a valid contract is found to exist, quasi-contractual relief is no longer available"). However, when the alleged wrongful conduct is distinct from the subject matter of the contract, the mere existence of a contract should not preclude a plaintiff from seeking quasi-contractual relief. Even though Northern may plead its quasi-contractual theories in the alternative, it fails to state a claim.

Northern alleges that it "conferred benefits upon each Brokerage in lending the QFV shares to the Brokerages, which permitted each Brokerage to enjoy economic benefits that would otherwise accrue to the owner of the borrowed shares" (plf. cplt., ¶ 83; *see also* ¶ 64). According to Northern, defendants agreed to use the shares to cover short sales, but instead, used the shares to execute tax arbitrage schemes. Even portrayed in these terms, defendants' retention of the benefits was wrong because it deviated from its contractual obligations, and the subject matter of the contract still governs. *See* Utility Audit, 383 F.3d at 688. The benefit, in the form of the QFV shares, were conferred pursuant to the terms of the lending agreements. In this sense, Northern's allegations fail to show that the lending agreements are inapplicable, and Northern does not demonstrate that the quasi-contract claims are truly in

the alternative to the breach of contract claim. Moreover, in the complaints each quasi-contract claim begins by incorporating the preceding paragraphs, which contain many references to the parties' lending agreements. *See* Sharrow Group v. Zausa Dev. Corp., 2004 U.S. Dist. LEXIS 24497, *9-10, 2004 WL 2806193 (N.D. Ill. 2004).

The absence of specific terms addressing the tax benefits does not open the door for a quasi-contract claim when the subject matter encompasses Northern's claim. Utility Audit, 383 F.3d at 689. Northern's quasi-contractual claims rest on its rights and responsibilities concerning the borrowed securities – subject matter specifically covered by paragraphs 4 and 5 of the lending agreements, and paragraphs 5 and 6 of the 1994 Bear Stearns agreement. Quasi-contract remedies do not step in at the moment a contract claim ends, i.e., when there is no breach of contract. To that extent, "quasi-contract is not a means for shifting a risk one has assumed under contract." Industrial Lift Truck Service Corp. v. Mitsubishi International Corp., 104 Ill. App. 3d 357, 432 N.E.2d 999, 1002, 60 Ill. Dec. 100 (Ill. App. 1st Dist. 1982). Rather, quasi-contract remedies are enforced in the absence of an actual contract, after courts imply a contract-in-law, as well as a promise to pay for a benefit received when there is no express promise. Barry Mogul and Associates, Inc. v. Terrestris Development Co., 267 Ill. App. 3d 742, 643 N.E.2d 245, 251, 205 Ill. Dec. 294 (Ill. App. 2d Dist. 1994). As alleged, Northern's complaint does not fall within the province of the quasi-contractual claims of unjust enrichment or *quantum meruit*. Count III is therefore dismissed.

## Count IV – Reformation

In Count IV, Northern alleges that the parties intended for defendants to return the economic value arising from the QFV shares to Northern, and requests the court to reform the agreements if their terms do not require such compensation (plf. cplt. ¶¶ 90, 96; 71, 77).

Northern contends that if the contract does not require compensation, it is due to a mistake by the parties. According to defendants, Northern only alleges that the parties made a mistake in the construction of the contract, which is a mistake of law. To state a claim for reformation, defendants continue, Northern must allege a mistake of fact.

To succeed in reforming the lending agreements, Northern "has the burden of proving by very strong, clear and convincing evidence that: (1) there has been a meeting of the minds resulting in an actual agreement between the parties, (2) the parties agreed to reduce their agreement to writing, and (3) at the time that the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted either through mutual mistake or through mistake by one party and fraud by the other." Klemp v. Hergott Group, 267 Ill. App. 3d 574, 641 N.E.2d 957, 965, 204 Ill. Dec. 527 (Ill. App. 1st Dist. 1994). "Reformation is a remedy by which a party has a contract rewritten so that it will conform to the agreement actually reached between the parties." Van Schouwen v. Connaught Corp., 782 F. Supp. 1240, 1244 (N.D. Ill. 1991); Elson v. State Farm Fire & Cas. Co., 295 Ill. App. 3d 1, 691 N.E.2d 807, 817, 229 Ill. Dec. 334 (Ill. App. 1st Dist. 1998) ("The underlying basis for a reformation action is the existence of a mutual understanding between the parties which the parties agreed to reduce to a writing, but through either mutual mistake or mistake on one side and fraud on the other, a material provision was omitted"); Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8, 314 F.3d 895, 903-04 (7th Cir. 2002) ("Reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing").

Turning to Northern's complaints, it alleges that the it and all defendants, at the time they formed the securities lending relationships, contemplated and agreed that Northern

would be entitled to all economic benefits of owning the borrowed shares (plf. cplt. ¶¶ 91; 72). Northern further alleges that defendants' eligibility to seek the tax credits arising from the borrowed shares was never contemplated, intended, or expressed by the parties.  *Id.* According to Northern, to the extent that the court construes the lending agreements to not require defendants to compensate Northern for the value of the tax credits, the contracts are the result of a mistake by Northern and each defendant.

A claim for reformation fails if it rests on a mistake of law, as opposed to a mistake of fact.  <u>Estate of Blakely v. Federal Kemper Life Assurance Co.</u>, 267 Ill. App. 3d 100, 640 N.E.2d 961, 966, 203 Ill. Dec. 811 (Ill. App. 2d Dist. 1994); <u>Wilcox v. Natural Gas Storage Co.</u>, 24 Ill.2d 509, 182 N.E.2d 158, 160 (Ill. 1962) (quoting <u>Ambarann Corp. v. Old Ben Coal Corp.</u>, 395 Ill. 154, 69 N.E.2d 835, 841 (Ill. 1946); *but see* <u>In re Estate of Hurst</u>, 329 Ill. App. 3d 326, 769 N.E.2d 55, 60-62, 263 Ill. Dec. 853 (Ill. App. 4th Dist. 2002).  The mistake of fact must relate to the time that the contract was drawn.  <u>Friedman v. Development Management Group, Inc.</u>, 82 Ill. App. 3d 949, 403 N.E.2d 610, 613, 38 Ill. Dec. 379 (Ill. App. 1 Dist. 1980).

Defendants argue that Northern's reformation claim essentially alleges a mistake of law, not fact, in that it challenges the legal effect of the lending agreements.  By using conditional terms in the complaint (plf. cplt. ¶¶ 93; 74)("To the extent that those provisions . . ."); *id.* ¶¶ 96; 77 ("should the court find that the terms . . .")), Northern does not challenge the legal effect of the contracts and does not posit alternate constructions of the lending agreements.  Here, Northern does not allege that the relevant provisions actually require compensation, nor does it contend that the defendants' interpretations of the contracts are incorrect.  Rather, it accepts, as it must, that the contracts can only be interpreted to not require defendants' return of the tax credits, and it alleges that the parties actually intended

for defendants to compensate Northern for the value of the tax credits, and that they failed to express that intent in the contracts due to a mistake. Northern has thus alleged "that the parties intended to say a certain thing and by mistake of fact expressed another thing" (31A Ill. Law and Prac. Reformation of Instruments § 8 (2005)), and it seeks to "change the contract so that it properly reflects the agreement originally reached by the parties." Friedman, 403 N.E.2d at 612.

While Northern states a claim for mutual mistake, its allegations of unilateral mistake must be dismissed. A reformation claim based on unilateral mistake must be coupled with an allegation of fraud. Briarcliffe Lakeside Townhouse Owners Ass'n v. City of Wheaton, 170 Ill. App. 3d 244, 524 N.E.2d 230, 235, 120 Ill. Dec. 465 (Ill. App. 2d Dist.1988). And, allegations of fraud are subject to the heightened pleading standard from Rule 9(b). Northern only states that, to the extent that defendants knew the contracts did not require compensation, defendants concealed that understanding and took advantage of Northern's mistake that the contracts actually required compensation. This allegation falls far short of the familiar "who, what, when, and where" information that Rule 9(b) requires.[8]

Count V–Rescission

In the final count, Northern incorporates the allegations that support its reformation claim, and seeks to rescind its loans of the QFV shares to defendants under the lending agreements (plf. cplt. ¶¶ 98; 79). Northern alleges that enforcing the agreements according to defendants' interpretation, "with respect to the QFV shares," would be unjust, and that

---

[8]Defendants do not raise a Rule 9(b) challenge as to Northern's allegations of mutual mistake. Rule 9(b) literally applies to all averments of mistake; although, some doubt has been cast on the rule's applicability. See Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992); G.T. Labs., Inc. v. Cooper Cos., 1994 U.S. Dist. LEXIS 8242, 1994 WL 274982 (N.D. Ill. 1994); but see Cagan v. Intervest Midwest Real Estate Corp., 774 F. Supp. 1089, 1097 (N.D. Ill. 1991).

Northern's receipt of the benefits arising from the QFV shares was a "core consideration" of the parties' lending relationships (*id.* ¶¶ 99; 80). To return the parties to the status quo before the QFV loans, Northern would return the fees charged in connection with those loans, and defendants would return "the benefits of ownership," they did not provide to Northern (*id.* ¶¶ 100; 82).

To state a claim for rescission under Illinois law, Northern must allege (1) a mistake that is of a material nature; (2) enforcement of the contract would be unconscionable; (3) the mistake occurred despite its exercise of due care; and (4) that rescission can place defendants in status quo ante.[9] Real Estate Value Co. v. USAir, Inc., 979 F. Supp. 731, 740 (N.D. Ill. 1997). By returning the parties to their pre-contractual positions, rescission's effect is to "undo the contract." Fleming v. United States Postal Serv. AMF O'Hare, 27 F.3d 259, 262 (7th Cir. 1994); Puskar v. Hughes, 179 Ill. App. 3d 522, 533 N.E.2d 962, 966, 127 Ill. Dec. 880 (Ill. App. 2d Dist. 1989).

Defendants argue that it is impossible to restore the status quo ante because the benefits of owning the QFV shares cannot be returned. The lending agreements entitled defendants to all incidents of ownership, subject to certain exceptions, including the return of all distributions made by QFV. As we held above, Northern has stated a claim that distributions could include the tax benefits arising from the borrowed QFV shares. Defendants depict the benefits of ownership as having "ethereal" value that cannot be quantified and returned. Even though the complaint calls for the return of "the benefits of ownership [defendants] wrongfully failed to turn over," Northern specifically identifies the value of the tax credits and returns as

---

[9] Since Northern has failed to state a claim based on unilateral mistake, coupled with fraud, any claim of rescission on the basis of fraud also fails.

the sums to be returned by defendants. Despite defendants' portrayal of the benefits of ownership, and their focus portrayal of the value those benefits as unquantifiable, Northern disambiguates the uncertainty of the benefits' value by providing concrete dollar figures. This is not a situation where the benefit conferred by one party was performance, which cannot be returned. Moreover, restoration of the status quo specifically considers restitution of consideration and any other benefits received under the contract. Puskar, 533 N.E.2d at 967 (quoting Finke v. Woodward, 122 Ill. App. 3d 911, 462 N.E.2d 13).

A stronger argument offered by defendants is that Northern seeks partial, rather than in toto rescission of the lending agreements. *See* Corbett v. Devon Bank, 12 Ill. App. 3d 559, 299 N.E.2d 521, 530 (Ill. App. 1st Dist. 1973) ("A rescission must be in toto; a party cannot affirm a contract in part and repudiate it in part; he cannot accept the benefits on the one hand while he shirks its disadvantages on the other"). Northern relies on Corbett for the proposition that the bar on partial rescission only applies to rescinding select terms while retaining the benefits. However, Northern's rescission claim seeks the relief that Corbett foreclosed, in that Northern hopes to rescind the contract only as applied to the QFV transactions, but retain the benefits it received from the other transactions under the lending agreements.

Northern finds support in Kaplan v. Keith, 60 Ill. App. 3d 804, 377 N.E.2d 279, 18 Ill. Dec. 126 (Ill. App. 4th Dist. 1978). In Kaplan, the court observed that a party may partially rescind a contract when that contract has parts that "are so severable as to form independent contracts." Northern does not allege that the provisions in the lending agreements are severable, much less those provisions as applied to specific transactions. "Whether a contract is severable depends on the intention of the parties." Quality Components Corp. v. Kel-Keef

Enterprises, Inc., 316 Ill. App. 3d 998, 738 N.E.2d 524, 538-39, 250 Ill. Dec. 308 (Ill. App. 1st Dist. 2000). Here, the contracts do not contain any authorization to sever either the provisions or the transactions from each other. Moreover, the 1994 Bear Stearns agreement specifically contains a provision whereby the parties agreed that all loans "constitute a single business and contractual relationship" (plf. cplt. (MS Securities/Bear Stearns) Ex. D. ¶ 22).

Rescission undoes the entire contract, invalidating the parties' rights under the contract. See Puskar, 533 N.E.2d at 966 ("Where a contract is rescinded, the rights of the parties under that contract are vitiated or invalidated"); Jackson v. Anderson, 355 Ill. 550, 189 N.E.2d 924, 926 (Ill. 1934) ("The contract must stand or fall as a whole, and no one may retain the consideration, or a part of it, and refuse to be bound by the contract or a part of it"). Under its rescission claim, Northern would retain contractual rights and benefits with respect to the non-QFV transactions. Count V is accordingly dismissed.

## Damages

Defendants invoke Fed. R. Civ. P. 12(f) and move to strike Northern's request for attorneys' fees and statutory interest that it paid to the IRS. As defendants observe, those damages represent more than 55% of the total sums that Northern seeks. According to defendants, even if Northern's complaint survives the motions to dismiss, it is not entitled to those damages. Defendants assert that those damages were not proximately caused by any act or omission attributable to them. Rather, defendants continue, the damages were caused by Northern's decision to claim the tax credits to which it was not entitled, and its choice to challenge the IRS in court. Northern alleged in the complaints that it would not have been forced to defend itself against the IRS had defendants not wrongfully claimed the tax credits, and that the damages sought were a foreseeable result of defendants' conduct (plf. cplt. ¶¶ 71;

52).

In Illinois, attorneys' fees and litigation expenses are generally not recoverable absent statutory authorization or contractual agreement between the parties providing for such recovery. Duignan v. Lincoln Towers Ins. Agency, 282 Ill. App. 3d 262, 667 N.E.2d 608, 613, 217 Ill. Dec. 519 (Ill. App. 1st Dist. 1996); Evink v. Pekin Ins. Co., 122 Ill. App. 3d 246, 460 N.E.2d 1211, 1214, 77 Ill. Dec. 647 (Ill. App. 2d Dist. 1984). This limitation on available damages, known as the "American Rule," is seen as an exception to the general rule in Illinois, which provides "that one who commits an illegal or wrongful act is liable for all of the ordinary and natural consequences of his act." Sorenson v. Fio Rito, 90 Ill. App. 3d 368, 413 N.E.2d 47, 51, 45 Ill. Dec. 714 (Ill. App. 1st Dist. 1980). Following the general rule, the court in Sorenson concluded that the plaintiff could recover fees and losses incurred when she attempted to obtain refunds for tax penalties that were assessed against her due to the defendant's negligent conduct. Id. The court emphasized that the damages sought by the plaintiff were not expenses incurred during her action against the defendant. Id. Similarly, Northern seeks to recover attorneys' fees and losses (in the form of statutory interest) incurred during litigation against the IRS, not this action against defendants.

According to Northern, the IRS brought actions against it for claiming the tax credits only because defendants wrongfully claimed the QFV tax payments for themselves on behalf of their customers. Making all inferences in Northern's favor, its claim of the tax credits was wrong only because defendants first claimed those credits. Of course, if Northern was not entitled to claim the tax credits, then it is unlikely that the fees and litigation expenses can be recovered. But we assume for the purposes of this motion that it was entitled to claim the credits. Further, defendants' criticism of Northern's decision to challenge the IRS is not

persuasive. Had Northern been successful (and it scored a partial, but short-lived victory in this court), it would have been able to retain the value of the QFV tax payments, which could have obviated this action against defendants. Returning to <u>Sorenson</u>, the court noted that the general rule allowed for recovery for a defendants' "illegal or wrongful act." We must inquire if this rule applies to defendants' alleged conduct.

A breach of contract is not wrongful "in the sense that a tort or a crime is wrongful." <u>Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.</u>, 313 F.3d 385, 389 (7th Cir. 2002). Courts following <u>Sorenson</u> often note that a plaintiff's damages must be caused by a defendant's tortious conduct. *See* <u>Avemco Ins. Co. v. Elliott Aviation Flight Servs.</u>, 86 F. Supp. 2d 824, 826 (N.D. Ill. 2000) ("To [recover fees] the plaintiff must show that the attorneys' fees are the natural consequence of the tortious act by the defendant against the plaintiff"); <u>Champion Parts, Inc. v. Oppenheimer & Co.</u>, 878 F.2d 1003, 1007 (7th Cir. 1989) ("Thus, to receive damages pursuant to the exception, Champion must show that its expenditures were the natural consequence of a tortious act by Oppenheimer against Champion"); <u>Industrial Color v. C P Inorganics</u>, 244 Ill. App. 3d 436, 613 N.E.2d 302, 304, 184 Ill. Dec. 275 (Ill. App. 3d Dist. 1993). In <u>Sorenson</u>, the plaintiff sought to recover fees incurred as a result of the defendant's negligence. *See also* <u>Sterling Radio Stations v. Weinstine</u>, 328 Ill. App. 3d 58, 765 N.E.2d 56, 60-61, 262 Ill. Dec. 230 (Ill. App. 1st Dist. 2002) (noting that the plaintiff "incurred attorney fees in an unsuccessful attempt to avoid paying the judgment entered against him which was the direct result of defendants' negligence").

Despite the emphasis placed on tortious conduct, there are decisions that support the recovery of fees and expenses incurred as a result of a defendant's breach of contract. *See* <u>Bituminous Casualty Corp. v. Commercial Union Insurance Co.</u>, 273 Ill. App. 3d 923, 652

N.E.2d 1192, 210 Ill. Dec. 216 (Ill. App. 1st Dist. 1995); <u>IBJ Schroder Bank & Trust Co. v.</u>

<u>Cory Assocs.</u>, 1998 U.S. Dist. LEXIS 17097, 1998 WL 765057 (N.D. Ill. 1998); <u>List v. Monco</u>,

1992 U.S. Dist. LEXIS 20572, 1993 WL 18377 (N.D. Ill. 1993); <u>Starkman v. Resolution Trust</u>

<u>Corp.</u>, 1994 U.S. Dist. LEXIS 14774, *17, 1994 WL 577233 (N.D. Ill. 1994) ("Although

[authority] refers to the defendant's "wrongful acts" and other tortious behavior, it does not

expressly provide that the third party litigation exception would not apply to a contract case").

Lastly, defendants do not point to any clause in the contract that prohibits the damages

Northern seeks, such as the clauses in the cases that they cite. *See* <u>Midwest Generation, LLC</u>

<u>v. Carbon Processing and Reclamation, LLC</u>, 2005 U.S. Dist. LEXIS 13606, 2005 WL 1563159,

*2 (N.D. Ill. 2005); <u>Tradewinds Aviation, Inc. v. Jet Support Services, Inc.</u>, 2004 U.S. Dist.

LEXIS 19380, 2004 WL 2533728, *5 (N.D. Ill. 2004). We decline, for now, to dismiss

Northern's prayer for attorneys' fees and litigation expenses incurred as a result of its

litigation with the IRS.

Several concluding observations are in order. Defendants' motions to dismiss have

helped focus the remaining claims, but we are left with the impression that we have arrived

where we started. As mentioned above, we asked the parties to submit supplemental

memoranda to address the real world consequences of the transactions, as well as our concern

regarding whose ox was actually gored. To that extent we still assume that Northern's duties

as trustee are distinct from its contractual relationships with defendants. The parties'

memoranda provided arguments that will no doubt continue to frame their positions, yet

extended hypothetical scenarios may unnecessarily complicate resolution by rewriting actual

events. Industry practice and custom will provide a prism through which we may interpret

the disputed contractual terms, and may ultimately yield reasonable interpretations of the

contracts. The lending relationships appear to have been relatively riskless transactions, with the nominal fee serving as the core consideration, and with the tax consequences not being topics of any substantial discussion. That the tax issues were not contemplated, at least in literal terms in the contracts, may have contributed to Northern's decision to claim the tax credits – the reasonableness of which will surely be debated. All this leads somewhere, but we are not sure where.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss Counts I and IV, and Northern's prayer for relief, are denied. The motions to dismiss Counts II, III and V are granted.

_James B. Moran_
**JAMES B. MORAN**
Senior Judge, U. S. District Court

_March 15_ , 2006.